And our first case will be Cassandra Paul vs. Hovensa, Ms. Lawrence. Ms. Lawrence, good morning. Good morning. Good morning. And... Brea R. Lawrence appearing on behalf of Cassandra Paul, and I will be reserving five minutes for rebuttal. Five minutes? Yes, thank you. And that request will be granted. Thank you. May it please the Court. Cassandra Paul raises four issues on appeal. She asserts error on behalf of the District Court when it entered summary judgment on her disability and gender discrimination failure to promote claim. She also asserts error on behalf of the District Court when it entered summary judgment on her failure to accommodate claim. Thirdly, Paul asserts error on the District Court when it entered summary judgment on her ADA lawful termination claim, not on its merits, but on exhaustion grounds. And finally, Paul asserts error on the District Court when it entered summary judgment on her breach of good faith and fair dealing claim. I will be addressing each one of these in turn. Cassandra Paul suffers from multiple sclerosis. Multiple sclerosis is a disability that's progressive. Ms. Lawrence, we're familiar with the facts, so don't waste too much of your time getting into the facts. Why don't you answer the questions. What is your response to your friend across the aisle's contention that you mischaracterized the 06 Williams memorandum? There was no mischaracterization. That memorandum was authored in response to the stressful position that the oil movement coordinators were in, excuse me, with regard to their work schedule, discipline, the fact that they could not get any meal breaks, rest breaks, use the bathroom. Yeah, but the record does not support your statement that Paul ever asked to be reassigned to avoid falls at work and so forth. We do not agree with that, Your Honor. The record is, if I may, the record is full of evidence that Paul requested a transfer at various times because of her disability. Transfer was also discussed ad nauseam behind the scenes among the various actors at home at Hovenza, but transfer never took place, Your Honor. Well, everyone wanted a transfer out of the job. The job is a very stressful job. That does it. You know, everyone likes a job that's not stressful, but the fact that everyone would like to have a less stressful job does not mean she was requesting, by reason of a disability, a transfer. Yes, Your Honor. She was requesting a transfer because the job was stressful. The record also shows that everyone else, yes, Your Honor, but transfer was not on the Hovenza's lack of Title III compliance with their facility. The record will show that that entire facility was not Title III compliant. Therefore, transfer was not on the table for Ms. Paul because if she was transferred, they would have to make other parts of the facility Title III compliant, which was never done. Therefore, she was contained in a position that was stressful and she needed a way out, and they failed to transfer her, Your Honor. Well, the fact that she had a stressful job and no one denies that, that doesn't mean they're discriminating against her because everyone's got the same stressful job. It's not a pleasant job. Let's put it that way. It's long hours and you've got to watch your step, otherwise your people could get killed. Yes, Your Honor. We're not disputing that, but she has always been able to do her job. No one has ever issued an opinion that she could not do her job. Because of the May 2008 event, she was suspended for five days. She was cleared by two physicians to return to work. Well, you're making a conclusion that she always did her job. That's not quite correct, is it? Well, Your Honor, every OMC coordinator makes mistakes. The record will reflect that Pierre made numerous mistakes. Hoffman caused a million-dollar mistake by the objective evidence testimony of Roland Alohar. OMCs made mistakes, were placed on caps, but they were never terminated. They were transferred out. They were never terminated. Paul was the first OMC to be terminated, allegedly because of performance issues. Well, look, no one wanted the job, but she was treated, was she not, the same as any other OMC, in short, rather badly. I don't want to criticize the apology, but she, like everyone else, was not treated with kid gloves. And as a practical matter, how can you really rule, how can we really rule in her favor when your client was found at work unconscious, unresponsive, and, you know, because of her lack of doing her job, they terminate her. Your Honor, they didn't terminate her because of lack of her doing her job. They terminated her because they did not want to accommodate her disability any further, Your Honor, which Title III and the ADA requires them to accommodate her. How can you argue a lack of failure to accommodate? They issued her a pass to go through the administrative building. They provided her a shuttle, they coordinated a taxi driver for her, they arranged co-workers for the driver to work, installed a ramp for her, remodeled a bathroom for her. How many more things does a company need to do for one employee? Your Honor, Title III required that that facility was supposed to be compliant in terms of access. There was never an ADA compliant bathroom. Her co-workers were required at some point in time to wheel her to the bathroom to use the restroom. Your Honor, the ADA was designed to protect the dignity interest of disabled employees. For them to require her co-workers to pick her up every day, making her and them late. For them to require them to wheel her into the bathroom. Your Honor, that significantly degraded her in the eyes of her co-workers and violates exactly what Title I, the ADA was designed to protect against. Well they can accommodate her, they don't have to accommodate her exactly as she wants to be accommodated as long as the accommodation allows her to perform her work. The accommodation directly impacted her ability to be able to receive that promotion to document supervisor. The people, the caucus, the panel that caucused to choose Al-Ahar credited Al-Ahar's ability to act up as supervisor as one of the reasons why he was selected. Paul wasn't chosen to act up as supervisor because one of the decision makers, Anna Lou, determined that working at night would be too hard for her because of her disability. That's objective evidence in the record. Let me ask you another specific question on the wrongful termination claim. Why in light of our decision in the case of O'Connor v. City of Newark should not your termination claim be time warped? Your Honor, the parties, Jovenza and Paul, were engaged in a hotly contested litigation in district court. A suit was filed and the EEOC complaint was also filed prior. The parties were in litigation. So many things occurred, including her termination, after the suit was filed. There was no reason to further exhaust. Jovenza conceded that they would litigate all of the termination and everything in the district court action. Where did they concede that? They stipulated to the third amended complaint, Your Honor. They stipulated to it. Just give us more discovery, they said. We stipulate to the third amended complaint. That should act as a waiver of any claim now that Paul failed to exhaust, Your Honor. The district court allowed the amendment, even though it was required to determine whether or not the amendment would be futile. These lulled Paul into thinking that there was no further need to exhaust. All of these factors qualify for several equitable doctrines that we have outlined in our brief, whether it be waiver, equitable tolling, equitable estoppel, judicial estoppel. You cannot lull a person into thinking, and mind you, the facts of the case show that the stipulated amended complaint was filed within 180 days of the occurrence. There was nothing, nothing could have, nothing prevented her from filing the complaint if it was raised and if Jovenza didn't lull her into thinking that there was no further need to exhaust. And it is our contention, Your Honor, that waiver versus Perkins states, and it's still the rule of this case, that there was no further need to exhaust. Didn't they include a claim of that failure to exhaust administrative remedies as part of their defense? Your Honor, the law that has been, from the Supreme Court and all the jurisdictions right now, require that a plaintiff plead, a more heightened pleading, to put people on notice, Your Honor, of her claims and offenses, and if she doesn't do that, the case gets kicked. You cannot put a general affirmative offense, failure to exhaust, without any more specific identification of why you're claiming that Paul didn't exhaust and not expect a waiver to occur, Your Honor. That was general. You claim general affirmative offenses, there was no reason Jovenza could be more specific that her termination required her to go back to the EEOC and file another complaint. It would have been done, except for the fact that she was lulled into thinking that the district court would handle her entire claims, there was no further need to exhaust, Your Honor. Now, you know, I'm interested, could you tell me why exactly you think that Pierce and Hoffman were similarly situated, or comparators, to your client? Paul was an OMC coordinator, Pierre was an OMC coordinator, Hoffman was an OMC coordinator. All made mistakes. Hoffman made a million dollar mistake, Paul made no such mistake of severity. Is there a little difference in what occurred here between them and your client? There is no difference, Your Honor. It was exactly the same type of mistake. OMCs make mistakes. Pierre misstops. Well, the problem is this, for us as judges, we're not here to be a super personnel office, and if this is a good faith decision that management can make, we're not here to second guess whether or not they made the wrong business decision. You've got to show that they, that this decision was based on something other than management's prerogative. There was direct evidence that all OMC coordinators made mistakes, including misstops. Misstops was the reason why they didn't do their job. She did not fall asleep at work, Your Honor, and she did not do her job. She was ill, and she was ill because of her disability, Your Honor. That is why her termination was wrong. She was admitted, her doctor returned her, allowed her to go back to work. Her own doctor said she was able to do the job. She returned to the job because she was certified as being able to do the work. Yes, Your Honor. So, so how can you complain that she couldn't do the work? She could do the work, Your Honor. I never, if I misstated that, I never stated that she could do the work. As I stated previously, both doctors certified that she could do the work. Her disability caused her to be ill that day. She was, she was using different medication. There were some issues with her son that caused her to be under stress, and stress exasperates her, her conditions, Your Honor. But she could do the work. No one said she could not do the work. Okay. Ms. Lawrence, we'll have you back on rebuttal. Thank you. May it please the Court. Your Honor, Judge Ann Thompson. What is your name? I'm sorry. Stephanie L. Adler-Panguris. It's a long one. Okay. Just wanted to make sure. For Hovenza. I apologize. And if you would, please, if you have a high ceiling, keep that microphone so it's, your voice gets into it. I will. Thank you, Your Honor. Okay. Judge Ann Thompson had the daunting task of reviewing essentially the same record that you all had before you. And as you can see, it's quite a lengthy task. It's quite a detailed task. And after doing so, issued a 56-page opinion in which she clearly demonstrated a masterful understanding of the facts. She applied the law that this Court and each of you have applied hundreds of times in Title VII and ADA cases. There are no novel issues of law before you, and the facts are not in dispute. Before I get into the merits of the case, Your Honor, I would just ask that you please view the facts through the correct lens and that you refer to Judge Thompson's opinion, Hovenza's motion for summary judgment, and our brief. It is our position that without looking at these facts through the correct lens, the facts as alleged by appellant will lead you astray and down the rabbit hole. The plaintiff has argued that, in fact, well, what I included in my brief... You know, talk about the facts. Yes, sir. You criticized her and filed an addendum showing her facts were not incorrect. I did, Your Honor. Yeah, but then she showed that you claimed she was spinning, but she countered that, and she sort of bet and said, well, you're spinning too, you know. So how can you criticize her factual analysis when you did the exact same thing in your reply? Well, I would argue, Your Honor, that the addendum, the appendix that we showed, we relied only on record facts. In a statement of facts presented to this court, I believe it's the obligation of all parties and attorneys to represent facts that are facts. You didn't even have a facts statement in your brief. In my appellate brief? You didn't have a... There was a facts section there. Yeah, okay. Yes, sir. You know, I think that the argument is, I believe that the counter, if I can characterize it, was, well, maybe those facts, as you've said in your appendix, are not actually in the record, but were allowed to make inferences. And our position is, yes, there's no question, the law, it's axiomatic, that the non-moving party is entitled to the favorable inferences, but they must be reasonable. Well, her reasonable inferences is that you previously determined that she was going to be fired because of her disability, and basically you set her up to fail by not transferring her and to staff the OMC position the way you should. And I appreciate that argument, but, Your Honor, there's nothing in the record. There's no record evidence. There's no question it's undisputed that she passed out at work in 2008. There's no question that during 2008 and 2009, Hovenza went through an exhaustive effort to ensure that whatever physician returned her to work understood the nature of the OMC job and the risks associated with failure to do so. It set forth many questions of her doctors about whether she needed accommodations, what did she need. And, in fact, Hovenza was very criticized by Ms. Paul for this process, but ultimately at the end of the day, in August of 2009, her physician indicated she needs no accommodations and you can return her to work. And what's ironic in this disability case is that Ms. Paul now is saying to this court Hovenza should have perceived her as disabled. It should have assumed that when she performed poorly over a year later, she couldn't do the job because of her disability. That would absolutely run afoul of the ADA. And I would be here on a different case. Your Honor, as you pointed out, Ms. Paul testified herself, that's the record evidence, that she could perform this job. To ask this court to say that, well, when she was performing poorly, Hovenza should have assumed that her disability caused her to perform would be a violation of the ADA. Moreover, after the September incident, they investigated that incident thoroughly, they interviewed Ms. Paul. Ms. Paul never said, you know what, I made these mistakes because of my disability. The ADA requires good faith on both sides, both the employer and the employee, and this court has held that numerous times. That interactive process goes both ways. Had Ms. Paul in September, in response to her first incident, had said, hey, time out. I don't know if I can do this job anymore. I need to get out. I need a transfer. I need to have another own seat. But isn't there enough evidence in this record to show that a reasonable fact finder could conclude that the stated reason for appointing, what's the band's name, Alohar, over her was not worthy of credence. Why couldn't a jury look at that? I mean, why does the evidence foreclose that being a reasonable fact determination? Your Honor, this court has held over and over again in many, many decisions involving the issue of pretext. Obviously, the issue of pretext has come up in many, many cases. The court is very clear that it is the burden of the plaintiff to demonstrate that the reasons articulated for the selection decision are unworthy of credence or that discrimination is the real motivation. It is not the employer's burden to prove the reason they gave. That's number one. Number two, the reasons that were given for Mr. Alohar's selection, his strong OMC experience, his interpersonal skills. Well, yeah, but he was waiting trial for rape. He couldn't talk to people in the office or something because of the criminal conflict or whatever. I forget now how that works. He was not clean as a driven snow either. None of us are, Your Honor. And you promoted him over her. We did promote him over her. Well, could the jury say, why did you promote this man? His background doesn't look so hotsy totsy here. Well, I think that to the extent, I guess I would disagree with the characterization that his background doesn't look so hotsy totsy. Well, was he accused of rape or was he not? It is true that he was accused of that. He went to trial and was acquitted. And I believe there's certainly, to the extent that you characterize his background as not so hotsy totsy, I suppose that's the thing in his background. Mr. Alohar was accused of a very serious crime. He engaged in his constitutional right to go to trial and he was acquitted. Well, isn't that something for her to take into consideration as to why he was acquitted, he's not guilty, but that's not something that she can't bring to the attention of a fact finder? I don't think that that raises a material issue of fact as to whether or not the reasons given for his selection. So basically the court has to look at the reasons in the context of the employment setting. To say that, let's say one of the reasons is good interpersonal skills. Appellant raised that issue, well, how could he have good interpersonal skills? He was accused of rape. Does that raise a genuine issue of material fact as to whether Mr. Alohar had good interpersonal skills because of that? The fact is he had good interpersonal skills. And no one ever said Ms. Paul didn't have good interpersonal skills. The whole argument that, well, to the extent they didn't think she did, it was because of driving and we speculate it's because coworkers didn't like her. Well, there was no testimony in the record that anyone said we choose you, Mr. Alohar, because you, Ms. Paul, have terrible interpersonal skills. No such record. The fact that the panel thought he did a good job as an OMC, that he had good interpersonal skills, and sat in an interview in which he was very impressive and provided a written plan, the fact that he was facing that charge could not possibly raise a material issue of fact as to whether or not it is true that he had good interpersonal skills. All right. Turning to the ADA claim. Yes, sir. Doesn't that claim fall squarely within the Waters decision, Waiters decision, that we have a liberal view toward the liberal approach to exhaustion that we follow in Waiters? Waiters or Waters, I forget that. Your Honor, it is our position that Waiters is a very different decision. There's no question that the definitive case on point is the Amtrak versus Morgan case. Both Waiters and Hicks were decided pre-Amtrak. Amtrak, the Supreme Court could not have been any clearer. A person, a grieved individual who wants to challenge an employment decision must file their charge within either 180 or 300 days. For every discreet act, the clock begins at the act, and that's it. That's the rule. And even if you were to, the fact that, and obviously that was certainly, Judge Fischer, you obviously reiterated that point in the O'Connor opinion, citing to the Morgan case and obviously adopting the fact that termination and discipline are discreet acts. Your Honor, even if you look at Hicks and Waiters, Waiters still confirmed for this court that the relevant test in determining whether an appellant was required to exhaust her administrative remedies is whether the facts alleged in the subsequent suit are fairly within the scope of the prior EEOC complaint or the investigation rising therefrom. In that case, it was a retaliation case. The EEOC in that case had never concluded its investigation. It found cause for retaliation, attempted to conciliate, and never closed it. And then her allegation was that they continued to retaliate. Well, your friend across the aisle says that she was led down a garden path. As a matter of fact, she said the district judge considered this as part of her disposition. Your Honor, I could not disagree with that more. I did not lull anybody. I'm up against a very worthy adversary, one of the best. And, Your Honor, when the district court judge issued its order allowing the plaintiff to file its second amended complaint, Ms. Paul hadn't even been terminated yet. What happened was is that in the first initial complaint and the first amended complaint, Ms. Paul did not allege a claim under the ADA. In the second amended complaint, she argued, oh, wow, we forgot we want to allege an ADA claim. We argued, undue delay, it's futile, you're going to add that at this point. And the court says, well, the charge mentioned disability. The first amended complaint, some of the facts had disability in it, even though there wasn't an ADA claim, so we're going to say it relates back. I would argue, Your Honor, that the plaintiff's statement to this court in her brief that the district court, and this is a quote, agreed that Paul was not required to continue exhausting discreet acts of discrimination appears in no order, in no opinion, in no document. Well, let me ask you, suppose we disagree with you, hypothetically. We, of course, have not conferenced on whether you're correct or not in your accusation. But if we disagree with you, to what extent can you legitimately say that Hoffman and the other person's name, Pierce? Pierre. Pierre. Pierre were not worthy comparators for that purpose? And, Your Honor, that's a very good question. That's why I asked it. And I appreciate it. I appreciate your compliment. The issue of whether someone's similarly situated, which of course goes to whether or not an inference of discrimination can be made, the courts have held, because obviously it's a big deal to say, I was treated differently because of my gender or my disability. Why couldn't the jury say that they are very similarly situated? Because I think the court, which acts as a gatekeeper to determine what appropriate evidence can go to the jury on this issue, has said that individuals have to be similarly situated in most respects. They don't have to be identical, but most respects. The incident to which she refers occurred in 2005 under a totally different supervisor. It was a totally different action, and all of that is in the record, so I'm not going to repeat it here, but it had to do with a faulty temperature gauge that ended up causing a rupture of a roof. Totally different time period. In this case, Ms. Paul was placed on caps for a complete dereliction of duty. Emma Hoffman and Pierre, what's the fellow's name, Pierre? Pierre, it's a woman, Emma Linda Pierre. And Pierre, they failed to report the high temperatures the place could have moved up to or something. Absolutely, and it was serious, and they were put on caps for it. It wasn't like they ignored them. They were disciplined for those. Well, so what's the difference between that and her falling asleep on the job? Well, she wasn't terminated for falling asleep on the job, Your Honor. That was in 2008. She was disciplined in October 15th for a September incident where she testified, she conceded to all the mistakes she made, and she was put on caps. She wasn't terminated. If it was and wanted to discriminate against her and they were so out to get her, they would have terminated her then, but they didn't. Well, Hoffman and Pierre were also AMCs. Yes, OMCs. OMCs. Is that the same job she got? It is the same job, but I believe that the case law is very clear that you have to have similar decision makers in order to create an inference of discrimination. The whole point of it is that this decision maker has two situations that are virtually identical, but I'm going to treat you differently than you, and that allows the court to create this inference of discrimination. This occurred in 2010. These incidents are in 2005 under totally different management. None of the managers are the same. Counsel, let me ask you about the wrongful termination claim and the timeliness of that. Yes. The district court found that that was time-barred. Yes. Ms. Lawrence argued that you consented to the filing of the Third Amendment complaint and consented to the way of the requirement that she exhausts her administrative remedies. Is that so? It is not so, Your Honor. And why isn't it so? Well, this court has argued that waiver is the known relinquishment of a right. Your Honor, after we had just litigated whether or not the district court was going to allow her to amend it a second time, then she asked, well, we're going to move to amend it a third time. The fact that we understand Rule 15 and the district court's application of Rule 15 and that it's a liberal standard certainly did not mean that our non-objection to her filing a piece of paper in court meant, hey, we concede liability, we waive all our defenses. We immediately asserted a defense. We knew that she hadn't exhausted administrative remedies. There's no need for us to be any clearer. To argue from a policy perspective that a defendant who does not object to the filing of an amended complaint substantively relinquishes its affirmative defenses I think would be a very, very dangerous proposition. All right, one other question. On the failure to accommodate claim, and I cited certainly a number of areas of accommodation, but isn't there a genuine issue of material fact here as to whether or not events properly accommodated Miss Paul's claim? Isn't there enough to get this question to a jury? I don't think there is, Your Honor, because I think that the two accommodations at issue in this appeal, which are the transportation from the front gate to the terminal building and the automatic bathroom door, I don't think there's a material issue of fact on either. Certainly on the transportation, it is undisputed based on Miss Paul's own testimony that she was fully accommodated. And this court has held over and over you're not entitled to the accommodation of your choice. And with respect to the bathroom door, the issue really that the district court faced was whether or not the issue of the breakdown of the interactive process, whether a reasonable trier of fact could find that Hovenza acted in bad faith. And it's appellant's burden to show that Hovenza acted in bad faith, not just that there's a delay, not just that they didn't do things perfectly. That wasn't what the ADA was intended to litigate. All right. Thank you very much. Thank you very much. We'll have Miss Lawrence back on rebuttal. Thank you. Hovenza raises a few issues I'd like to respond to. First, with regard to the Amtrak case on the issue of exhaustion. The Amtrak case did not overrule waiters. Amtrak was a backwards-looking case. It involved a plaintiff who was trying to litigate old and state claims that occurred outside of the 300-day time period. Waiters was a Third Circuit case that recognized that where litigation is ensuing and events are still unfolding, there is no point for further exhaustion, especially here, as in the case where Hovenza specifically requested more discovery. Let's just get this all done in this forum. We will litigate it all here. It was not just a matter of consenting to the filing of a paper. They consented to litigating the termination claim in the district court, requested more discovery, and the extension of the discovery deadlines to be able to do so. Waiters is still the law of this circuit, and Paul's claims that she no longer had to exhaust fall squarely within waiters. Amtrak did not overrule it, and the decision in O'Connor did not overrule waiters. And if there is an intra-circuit conflict, the internal operating procedure 9.1 requires that the court panel embank to resolve this issue, but we do not believe there is such conflict. Well, it also says that we have to follow the first case. Yes, Your Honor. It also says you have to follow the first case. You are correct. With regard to Hoffman and Pierre being appropriate comparators, Hoffman and Pierre were both OMC coordinators. Hovenza can point to no time in the record where an OMC coordinator who had performance issues were terminated. They didn't engage in any misconduct while they were CAPs, did they? Pierre had a disciplinary history as long as my arm, Your Honor. No, no, while they were CAPs. CAPs, when they were on CAPs. Your Honor, she was placed on CAPs when other people for similar conduct would never have been placed on CAPs. Well, no, you're not answering my question. Don't you agree that Pierce and Hoffman committed, nor Hoffman committed any misconduct while they were on probation or whatever you want to call it? No, we don't concede that, Your Honor. No. Well, the record doesn't show that they did anything wrong when they were on CAP, whatever you call it. On CAPs. Your Honor, yes, Pierre was on CAPs. The record is unclear as to whether or not while she was on CAPs she committed further offenses, but she was on CAPs several different times, including the record reflects that she received a last warning letter in 2005, was placed on CAPs subsequent to 2005, and yet she was not terminated. She was transferred out. Hoffman blew up a tank costing Hovenza a million dollars, and he was not terminated. Paul made no such errors of gravity, and it's for a jury to determine whether or not the errors of Paul were. These were all created post hoc, and these issues were created to hide the fact that they wanted to terminate her, Your Honor. What is your best evidence that they discharged her because of her disability or because of ethnicity or gender or inappropriately? What's your best evidence of that? Van Gerp made the statement that he did not want to transfer her as a problem to another department. That's in the record, and it remains undisputed. When a decision maker, Van Gerp, who's hired in the all-male managerial chain of command, says that he doesn't want to transfer a problem to another department, that is direct evidence of disability discrimination. She was somewhat of a little problem there at the very least. You will concede there was a problem there. Because of her disability, Your Honor, she was a problem? Well, a problem in that she had a disability, and they tried to accommodate it, and it didn't seem to satisfy her. The accommodation was to transfer her out. They didn't do that. They transferred everybody else out, Your Honor. They didn't transfer her out because it required that more Title III ADA-compliant measures would have had to have taken place at other parts in the facility. Every ADA measure that they took, access measure they took, compliant bathroom, building and ramp, was because of her. Amalou could recite that it cost him $250,000. Who remembers that? If it wasn't because it was in his brain that any place she goes, they would have to spend money to be able to fit the facility and actually meet their Title III obligations. That's why everyone else who was not disabled could find a path out. But Paul was stuck in the OMC coordinator. They didn't want to meet their Title III obligations and spend more money to make the facility compliant. Period. That's discrimination. And Paul was terminated and not transferred out, Your Honor, because they did not want to make the facility compliant. And they concocted performance issues when no other coordinator was ever terminated for performance issues because of the nature of the job, Your Honor. Okay. Thank you, Ms. Lawrence. Thank you. Your time is up. We thank both counsel for excellent arguments on a complex case with a big record, and we'll take the matter under advisement. Thank you.